## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| Cainhoy Athletic Soccer Club, | Civil Action No. 2:15-4917-RMG |
| Plaintiff, | |
| v. | **ORDER** |
| The Town of Mount Pleasant; Ken Ayoub, Alton Carrier, Ken Glasson, Paul Gawrych, Chris Nickels, Chris O'Neil, Gary Santos, Mark Smith, Thomasena Stokes-Marshall, *and* Linda Page, *in their official and personal capacities*, | |
| Defendants. | |

This matter is before the Court on Defendants' motion for summary judgment (Dkt. No. 5). For the reasons set forth below, the Court grants summary judgment for Defendants.

## I. Background

The Town of Mount Pleasant, through its recreation department ("MPRD"), offers various recreational soccer programs to youth. In 2012, Mount Pleasant outsourced its selective or "elite" youth soccer programs[1] to the Mount Pleasant Soccer Booster Club, Inc. (the "Booster Club," then doing business under the name South Carolina United Mount Pleasant ("SCUMP")). The agreement between Mount Pleasant and SCUMP included mutual exclusivity provisions: SCUMP agreed not to compete with MPRD's non-selective soccer programs, and Mount Pleasant agreed

---

[1] "Selective" as used herein describes programs that require players to qualify or "try out" as a prerequisite to enrollment. Such programs are sometimes described as "elite" programs, although over one thousand players in such programs reside in Mount Pleasant. *See* Statement of Facts, *infra*.

-1-

not to allow other soccer clubs to use MPRD fields. SCUMP subsequently changed its trade name to United Soccer Academy Mount Pleasant ("USAMP").

Plaintiff Cainhoy Athletic Soccer Club ("Cainhoy") requested that Mount Pleasant provide it the same use of MPRD fields as provided to USAMP. Mount Pleasant declined because of the exclusivity provision in its contract with USAMP. On October 28, 2015, Plaintiff filed the present action against Mount Pleasant, the mayor, the members of the town council, and MPRD's recreation director alleging that the exclusivity provision of the agreement between Mount Pleasant and USAMP violates Plaintiff's equal protection rights under the Fourteenth Amendment to the U.S. Constitution by unconstitutionally discriminating against soccer clubs other than USAMP. Plaintiff seeks declaratory and injunctive relief and actual and punitive damages pursuant to 42 U.S.C. § 1983.

## II.    **Legal Standard**

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Disputes of material fact are genuine if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party," *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996), but it must also "prevent factually unsupported claims and defenses from

-2-

proceeding to trial," *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993) (internal quotation marks omitted).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## III.    Statement of Facts

### A.    Youth Soccer Organizations and Programs

Cainhoy is a non-profit corporation formed in December 2008. S.C. Sec'y of State Filings, *available at* http://www.sos.sc.gov. Until recently, Plaintiff operated four youth soccer programs: Little Kickers, Junior Academy, Select, and Premier. Little Kickers was a program for children three to eight years old.[2] Cainhoy Athletic (Apr. 12, 2016) [https://web.archive.org/web/20160412120712/http://cainhoyathletic.com/]. In May 2016, Cainhoy renamed this as "Micro Academy." Cainhoy Athletic, http://cainhoyathletic.com (last

---

[2] Youth soccer programs designate ages with the prefix "U" for "under" as of a cutoff date. For example, a U8 child is a child between seven and eight years of age as of the cutoff date, typically August 1st of the upcoming fall/spring seasons (but clubs have recently moved to a calendar year cutoff). For consistency with common usage, this Order refers to ages without the "U" prefix, *e.g.*, a "U8" child is a seven-year old. Any discrepancy between the age ranges stated in this Order and the actual age calculations used by youth soccer programs is immaterial to this case.

visited May 3, 2016). Junior Academy is a selective program for children from seven to eleven years old. *Id.* Select was a selective program for children aged twelve and over. Cainhoy Athletic (Apr. 12, 2016) [https://web.archive.org/web/20160412120712/http://cainhoyathletic.com/]. Premier is Cainhoy's program for the "most competitive players in limited age groups/genders." *Id.* The Select program may have been recently folded into the Premier program in May 2016. *Compare* Cainhoy Athletic (Apr. 12, 2016) [https://web.archive.org/web/20160412120712 /http://cainhoyathletic.com/] *with* Cainhoy Athletic, http://cainhoyathletic.com (last visited May 3, 2016). Registration and club fees and were $200 or $250 per year (depending on player age) for Little Kickers, $350 for Junior Academy and for Select, and $550 for Premier. Cainhoy Athletic (Apr. 12, 2016) [https://web.archive.org/web/20160412120712/ http://cainhoyathletic.com/].[3] Competition costs, *e.g.* tournament and league fees, travel costs, and uniforms, are not included in club fees. *Id.* Need-based financial assistance is available on request through an honor system—Cainhoy does not review family's personal financial information. *Id.* Cainhoy was organized to provide "opportunities for the youth of our region (primarily East Cooper) to participate in organized programs of quality soccer at low cost." (Aff. of David Tunesi ¶ 2, Apr. 4, 2016, Dkt. No. 12-1.) In addition to providing soccer at an affordable cost, Cainhoy was also founded to "help [Berkeley County] area parents who once took a 45-minute trek to Mount Pleasant's crowded practice fields." Jessica Johnson, *Cainhoy parents team up for new soccer club*, Post & Courier (July 16, 2009) (contemporaneous news report on founding of Cainhoy). Now, Cainhoy has 904 players, of whom 739 are Mount Pleasant residents. (Tunesi Aff. ¶ 8.) Cainhoy regularly uses three soccer fields in Mount Pleasant: McAlister-Smith Soccer

---

[3] Cainhoy increased prices in May 2016; Cainhoy now charges annual fees of $225 or $275 for Micro Academy, $425 for Junior Academy, and $625 for Premier. Cainhoy Athletic, http://cainhoyathletic.com (last visited May 3, 2016).

-4-

Field, Old Laing Middle School, and Longpoint Community Soccer field. Cainhoy Athletic, http://cainhoyathletic.com (last visited May 3, 2016).

The Mount Pleasant Soccer Booster Club, Inc., is a non-profit corporation formed in August 1981. S.C. Sec'y of State Filings, *available at* http://www.sos.sc.gov. Under the United Soccer Academy Mount Pleasant ("USAMP") trade name, it operates two selective youth soccer programs: Junior Academy and Select.    United Soccer Academy Mount Pleasant, http://www.usamountpleasant.com (last visited Apr. 29, 2016). Junior Academy is for children ages seven to eleven, and Select is for children aged twelve and over. *Id.* USAMP teams are professionally coached and travel throughout South Carolina to compete. (Aff. of Matt Job ¶¶ 10, 12, Undated, Dkt. No. 13-2.) Annual registration and club fees are $745 or $945 for Junior Academy (depending on player age) and $1,025 for Select (for children aged fifteen to eighteen, Select is for the fall season only, with fees for the half-year of $585). United Soccer Academy Mount Pleasant, http://www.usamountpleasant.com (last visited Apr. 29, 2016). Competition costs are not included in club fees. *Id.* Need-based financial assistance is available; the application requires submission of tax returns and pay stubs to USAMP for review. *Id.* USAMP has 962 players. (Press Release, United Soccer Academy Mount Pleasant (Mar. 18, 2015), Dkt. No. 5-3 at 6.)

The Town of Mount Pleasant is a South Carolina municipality; through the MPRD, it operates three youth soccer programs: Fundamental Sports (children aged five to eight), Developmental (children aged eight to thirteen), and Recreational (children aged eight to eighteen). Recreation, Mount Pleasant, SC, http://www.tompsc.com/index.aspx?nid=203 (last visited Apr. 29, 2016). MPRD's programs are not selective programs. *Id.* The Fundamental Sports and Recreational programs only compete with other Mount Pleasant teams, and they use

-5-

unpaid coaches who need not be licensed. (Job Aff. ¶¶ 7, 9.) The Developmental program practices two or three times per week and competes in the Coastal League (*i.e.*, does not travel outside of the coastal area of South Carolina). (*Id.* ¶ 11.) Annual registration and fees are $110 (Mount Pleasant resident) or $210 (non-resident) for Fundamental Sports, $310 (resident) or $410 (non-resident) for Developmental, and $110 (resident) or $210 (non-resident) for Recreational. Recreation, Mount Pleasant, SC, http://www.tompsc.com/index.aspx?nid=203 (last visited Apr. 29, 2016).

The Unites States Soccer Federation, the official governing body of soccer in the United States, operates the U.S. Soccer Development Academy. (Aff. of F.C. Wichmann, Jr. ¶ 5, Undated, Dkt. No. 5-3.) U.S. Soccer Development Academy teams are the highest level of youth soccer in the United States ("ultra-elite"); each team is affiliated with a professional team and a youth soccer club. (*Id.*) The South Carolina Battery Academy ("SCBA"), a program for male players aged twelve and older who aspire to play at the collegiate scholarship or professional levels, is the only "ultra-elite" youth soccer program in South Carolina. (*Id.*) It is affiliated with Charleston Battery, a professional soccer team in Charleston, South Carolina, and with USAMP. (*Id.*)

### B.    The Agreement Between Mount Pleasant and USAMP

According to MPRD director Ken Ayoub, MPRD's selective youth programs were consuming excessive MPRD staff time—because of the complexity of out-of-town travel arrangements and because of time spent "coordinating with parents in regards to participation in the elite program." (Aff. of Ken Ayoub 1, Jan. 8, 2016, Dkt. No. 5-2.) Mount Pleasant therefore decided to outsource its selective youth soccer programs to the Booster Club. (*Id.*) Meeting minutes contemporaneous with the finalization of the outsourcing agreement between Mount Pleasant and the Booster Club, executed on February 9, 2011 (Compl. Ex. B [hereinafter the "Agreement"]), confirm Mr. Ayoub's account of the rationale for the agreement. *See* Meeting

Mins., Mount Pleasant Town Council Recreation Committee 2–3 (Jan. 31, 2011) (town administrator Eric DeMoura stating, in describing the rationale for the Agreement, that "As part of our austerity measure since the great recession began we have been looking at certain ways to pull back from activities that from a staff level were above and beyond traditional recreation programs"); *see also* Recreation Comm. Meeting Mins. 5 (Dec. 5, 2011) (Mr. Ayoub stating, "a trend is going on that teams want to travel around and play other communities and area[s]. . . . That is getting out of the realm of the recreation department" and Ms. Stokes-Marshall stating, "from past experience that the Town has tried to get out of that [traveling teams] and [that] she supports that effort to get out of that because it molds our recreational activities in those categories beyond the point of providing quality recreational for the residents of the town").

There was no bidding process or consideration of other providers; MPRD and the Booster Club have a long-standing relationship. (Agreement "Program" ¶ 6.) Mr. DeMoura told the Recreation Committee,

> More complicated has been our discussion with SC United Mt. Pleasant (SCUMP). The reason being is without them early on the Town would not have the soccer program we have to[da]y. We came together a decade ago as partners to help form the type of soccer program we have today and these folks deserve a lot of credit. The Town could not have done it without them. It has not been easy to pull back as we have a long standing relationship with the Soccer folks. I have to praise the board members of SCUMP and in particular Kevin Carter for coming together with the Town and partnering with the Town on a different relationship that has a new beginning for the Town and the Soccer.

Recreation Comm. Meeting Mins. 3 (Jan. 31, 2011). Previously, the Booster Board donated $20,000 toward the construction of restrooms for a concession stand at Patriot's Point. *Id.* at 4–5. Recreation Committee minutes state that the donation "may be the largest single donation ever received by the Town of Mount Pleasant." Recreation Comm. Meeting Mins. 2 (June 5, 2007). Return of that donation was a term of the Agreement. (Agreement "Facilities" ¶ 13).

The Agreement provides that the Booster Club, then operating as SCUMP and now operating as USAMP, assume management of MPRD's Junior Academy and Select programs. (Agreement "Program" ¶ 2.) USAMP must maintain comprehensive liability coverage of $1 million. (Agreement "Facilities" ¶ 16.) MPRD gives USAMP exclusive use of six soccer fields in return for a fee of $5,000 plus approximately $52 per participant. Recreation Comm. Meeting Mins. 3–4 (Jan. 31, 2011). The exclusive use provision does not apply to tournaments; however, MPRD cannot make those fields available to any other soccer club for tournaments. (Agreement "Facilities" ¶ 1, "Tournaments" ¶ 10); *see also* Recreation Comm. Meeting Mins. 3 (Jan. 31, 2011). Mount Pleasant is responsible for field maintenance; maintenance costs beyond what is considered normal are reimbursed by USAMP. (Agreement "Facilities" ¶¶ 7–9.) All fields are closed for maintenance from June 1st to August 15th; during that time, USAMP may use fields at Trident Academy (which is also one of USAMP's six exclusive-use fields) or Longpoint on a non-exclusive basis. (Agreement "Facilities" ¶ 8.)

The Agreement has a mutual exclusivity provision: MPRD cannot offer soccer programs that compete with MPRD's programs, and *vice versa*. USAMP may market their program through MPRD, but, "[b]ecause of the special and unique relationship that [USAMP]/MPRD has enjoyed over the years," MPRD may "not support any other soccer club with access to facilities and/or resources" nor "assist such clubs with promotion or marketing." (Agreement "Program" ¶ 6.) The agreement explicitly allows MPRD to use other providers for soccer camps, (Agreement "Program" ¶ 10), but the prohibition on supporting any other soccer club, fairly read, would prohibit MPRD from using other soccer clubs to provide camps.

Finally, either party may cancel the Agreement on six months' notice. (Agreement "Cancellation of Agreement.")

-8-

The Agreement was reported by the Town Administrator at a public meeting of the Recreation Committee of the Mount Pleasant Town Council on January 31st, 2011.[4] Recreation Comm. Meeting Mins. Approval was unanimous. *Id.* at 6. Comments were solicited form the public; no person spoke against the agreement. *Id.* Council member Elton Carrier asked the only question about the need to reimburse the Booster Club's $20,000 donation. *Id.* (Mr. Carrier is now chairs the Recreation Committee, but at the time he was not a member of the committee). That was the only question asked by anyone present. The committee reported the Agreement to the Town Council, which on February 8, 2011 adopted a resolution approving the agreement and authorizing the mayor to execute it. Council Meeting Mins. 12, Town of Mount Pleasant (Feb. 8, 2011).

### C.    Assertions by Plaintiff that Fail to Create Genuine Factual Disputes

Cainhoy argues that the agreement is a sham and a pretext—that it is an agreement with a non-existent entity used to discriminate against Cainhoy as a class of one (and, by implication, to discriminate against families that cannot afford USAMP's fees). Cainhoy attempts to support that theory of the case with factual assertions that are unsupported and sometimes clearly false. At summary judgment, factual assertions should be supported by "(A) citing particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited establish the presence of a genuine dispute, or that an adverse party cannot produce admissible

---

[4] The Recreation Committee consisted of three members of the Town Council: Paul Gawrych, Thomasena Stokes-Marshall, and John Burn. This meeting was also attended by Mayor Billy Swails and three other members of the Town Council: Elton Carrier, Ken Glasson, and (now-mayor) Linda Page. Thus, the mayor and six of eight town council members attended the meeting. Recreation Comm. Meeting Mins. (Jan. 31, 2011).

evidence to support proffered facts." Fed. R. Civ. P. 56(c)(1). Where a party fails properly to support an assertion of fact, the Court may "consider the fact undisputed for purposes of the motion" for summary judgment. Fed. R. Civ. P. 56(e)(2).

Even when filing the complaint, Cainhoy should have known—before discovery—that many of its factual allegations were false. The Court finds that there is no genuine dispute that following complaint allegations are unsupported by the record, and, indeed, are false.

First, Cainhoy alleges that the Agreement gave SCUMP the "exclusive right to offer camps through MPRD." (Compl. ¶ 14.) The Agreement states, "MPRD will retain the option to use other providers that become available for camps as well." (Agreement "Program" ¶ 10.) That is not an arguable difference of interpretation—the Agreement plainly contradicts Plaintiff's allegation.

Second, Cainhoy alleges that the Agreement "gave SCUMP the exclusive right to use Trident Academy and/or Longpoint fields during the summer months." (Compl. ¶ 16.) The Agreement actually states, "MPRD shall allow use of the Trident Academy and/or Longpoint fields during the summer months (June 1 to August 15) for SCUMP to conduct a limited amount of training. Use of the Trident and/or Longpoint field will be dependent on the Town's Public Services' recommendation on such use, maintenance schedule for the fields and/or any related program use by MPRD, Trident Academy or Longpoint HOA." (Agreement "Facilities" ¶ 8.) In fact, Cainhoy itself regularly uses the Longpoint HOA field. *See* Fields, Cainhoy Athletic http://cainhoyathletic.com/fields (last visited May 6, 2016).

Third, Cainhoy alleges that SCUMP "is no longer a legal entity doing business." SCUMP was never a legal entity. SCUMP was the trade name for the Mount Pleasant Soccer Boosters Club, which has been continuously incorporated since 1981, and which currently does business as USAMP. *See* S.C. Sec'y of State Filings, *available at* http://www.sos.sc.gov.

Fourth, Cainhoy alleges, "United Soccer Academy is non profit corporation doing business in Charleston County," that Mount Pleasant "does not have any agreement with United Soccer Academy," and that Mount Pleasant "yet allows United Soccer Academy same exclusive use of the fields as SCUMP." USAMP is not and has never been a corporation. It is the new trade name for the Mount Pleasant Soccer Boosters Club. Mount Pleasant certainly does have an agreement with USAMP. It is difficult to understand how Cainhoy could have been unaware of this. The new name and logo were unveiled at a public event at the Mount Pleasant Town Hall attended by the Mayor and Town Council, on March 19, 2015. (Press Release, United Soccer Academy Mount Pleasant (Mar. 18, 2015), Dkt. No. 5-3.) Even the local news report regarding the filing of the present action (for which Cainhoy president David Tunesi was interviewed) stated, "The other soccer operation is United Soccer Academy Mount Pleasant, which until this year was called South Carolina United Mount Pleasant." Tommy Braswell, *Cainhoy youth soccer program files suit against Mount Pleasant over field access*, Post & Courier (Nov. 20, 2015).

Furthermore, even with the benefit of discovery, Cainhoy continues to make unsupported factual assertions in its opposition to summary judgment, which, again, are insufficient to raise genuine factual disputes.

First, Cainhoy repeats the allegation that the "SCUMP club does not currently possess an agreement with the town." (Resp. Opp'n Summ. J. 22, Apr. 4, 2016, Dkt. No. 12.) Cainhoy provides no support whatsoever for that allegation. But Defendants provide ample evidence that the Booster Club operated under the SCUMP trade name until its board voted to operate under the USAMP trade name. (Wichmann Aff. ¶ 3–4 & Ex. A (Form W-9 and press release regarding name change); *see also* Job Aff. ¶ 1; Ayoub Aff. 4–5.) Cainhoy argues, *ipse dixit*, that Mount Pleasant's and USAMP's "failure to sign an addendum" to the Agreement regarding the name change "is

another example of the Town's loose interpretation and enforcement of the agreement" (Resp. Opp'n Summ. J. 22), but the Agreement specifically provides that MPRD's approval of Booster Club board resolutions and by-law changes is not required (Agreement "Program" ¶ 9).

Second, Cainhoy complains, "the Town's policy prohibits anyone associated with a 'soccer club' other than SCUMP from using its facilities based on the 2011 Agreement." (Resp. Opp'n Summ. J. 6.) That is not true. Persons associated with clubs other than USAMP are not prohibited from Mount Pleasant facilities. The only prohibition at issue is the prohibition against Cainhoy-organized events on MPRD soccer fields. Mount Pleasant children are not otherwise prohibited to use public fields because of their enrollment with Cainhoy.

Third, Cainhoy asserts, "SCBA has used Mt. Pleasant fields in violation of the Agreement." (Resp. Opp'n Summ. J. 7–8.) For support, Cainhoy refers to Mr. Ayoub's deposition testimony that SCBA asked for and was denied use of Mt. Pleasant fields, and Mr. Wichmann's affidavit, which states that SCBA does not use Mount Pleasant fields, but instead uses fields in Summerville, James Island, and Orangeburg. (*Id.*) Cainhoy nonetheless asserts, "SCBA has used the Mt. Pleasant fields and plaintiff will need additional discovery to determine how SCBA has been using the fields." (*Id.* at 8.) Plaintiff has had discovery—resulting in multiple sworn statements that SCBA does not use Mount Pleasant's soccer fields. There is no genuine dispute that SCBA does not use Mount Pleasant fields for practice or other regular activities. SCBA did play two games on MPRD fields in the fall 2015 season. MPRD asserts that it allowed those games because it thought SCBA was part of USAMP. (Defs.' Reply Supp. Summ. J. 5, Apr. 14, 2016, Dkt. No 13.) Now that it knows SCBA is merely "affiliated" with USAMP (Wichmann Aff. ¶ 5), it no longer allows SCBA to use Mount Pleasant fields (Reply Supp. Summ. J. 5.)

-12-

Fourth, Cainhoy asserts that Team First Soccer Academy, Nottingham Forest Football Club, and the Ralph Lundry Camp were allowed to conduct camps using MPRD fields, in violation of the Agreement. In support, Cainhoy quotes Mr. Ayoub's deposition testimony. When asked "And does this agreement allow other clubs to use the fields for camp purposes," Mr. Ayoub answered "No sir." (Resp. Opp'n Summ. J. 11.) But, as Mr. Ayoub further testified, the Agreement "does not prohibit Mt. Pleasant Recreation Department from trying to bring in camps for Mt. Pleasant residents." (Ayoub Dep. Tr. 96:8–10.) As noted above, the Agreement's plain language unquestionably allows MPRD to use camp providers other than USAMP. Mount Pleasant is merely prohibited from supporting soccer clubs that compete with USAMP.

Neither Team First Soccer Academy nor Nottingham Football Club nor the Ralph Lundry Camp is a competing soccer club within any reasonable interpretation of the Agreement. Team First Soccer Academy is a company founded by Olympic Gold Medalists Mia Hamm, Tisha Venturini Hoch, and Kristine Lilly. Team First Soccer Academy, http://teamfirstsocceracademy.com/about/ (last visited May 6, 2016). It conducts weekend camps at hosting sites around the country. *Id.* Nottingham Forest Football Club is an English professional soccer team that offers a summer youth camp in Mount Pleasant. Ralph Lundy is the head coach of the College of Charleston's soccer team; his camp is held on College of Charleston fields, not on fields owned by Mount Pleasant. (Aff. of Ian Evans, Undated, Dkt. No. 13-1.)

Fifth, Cainhoy asserts that the SCBA hosted the Charleston Battery Challenge Cup (a tournament) on MPRD fields, in violation of the agreement, which provides that soccer clubs other than USAMP may not host tournaments on MRPD fields. Cainhoy states, "[Mr.] Ayoub indicated he believed SCUMP put on the tournament. (Ayoub 91/15 - 92/24). However, this tournament was hosted by SCBA . . . ." (Resp. Opp'n Summ. J. 9.) Mr. Ayoub's testimony was correct and

Cainhoy's unsupported, contrary assertion is false. USAMP hosted the Charleston Battery Challenge Cup. (Application to Host a Tournament or Games, Mar. 26, 2015, Dkt. No. 13-2.)

Sixth, Cainhoy asserts, "SCUMP directly competes with MPRD Programs," (Resp. Opp'n Summ. J. 15.) That is untrue. USAMP offers only selective programs; MPRD offers only non-selective programs. Cainhoy's Little Kickers program (now known as Micro Academy), however, direct competes with MPRD's Fundamental Sports program. Cainhoy's assertion that USAMP offers a program that competes with MPRD's Fundamental Sports program is simply false. Cainhoy claims "MPRD knows about programs SCUMP offers to these children [ages five to nine] but turns a blind eye for reasons unknown. Regardless, this creates questions of fact for the jury." (*Id.* at 16.) Plaintiff offers no support for its assertion that MPRD "knows about" such programs. Regardless, if Cainhoy genuinely knew of any such program, Cainhoy would have disclosed it to the Court. Because that Cainhoy offers no record support for the existence of any such program, because Cainhoy declines even to identify any such program, and because USAMP does not publicly advertise any such program, the Court finds it undisputed that there is no such program.

Cainhoy also argues that USAMP's programs compete with MPRD's Developmental program because the children are the same age and because they play on teams that compete in the same Coastal League. (Resp. Opp'n Summ. J. 17–20.) However, the service offered by USAMP and MPRD is soccer training, not a league to play in. There is no genuine dispute that MPRD's non-selective programs (priced $110 to $310 per year for residents) and USAMP selective programs (priced $745 to $1,025 per year) are not competing for enrollments from the same youth players. (*See* Evans Aff.)

Seventh, Cainhoy points to three recent games in which teams other than MPRD or USAMP teams were allowed to use MPRD fields, in violation of the agreement, as evidence of

"arbitrary and capricious" enforcement of the Agreement. (Resp. Opp'n Summ. J. 7.) Two of those involved SCBA, which, as noted above, MPRD thought was part of USAMP. Otherwise, Cainhoy points to a single match between teams from Myrtle Beach and Summerville on February 28th, 2016. (Tunesi Aff. ¶ 11.) MPRD concedes that it was an error to allow that game, but notes that in spring 2016 there were 244 games and that errors can occur. (Evans Aff.) There is no genuine dispute that enforcing the Agreement "only" 99.6% of the time is not "arbitrary and capricious" enforcement.

The Court therefore finds that there is no genuine dispute (1) that the Agreement between Mount Pleasant and the Booster Club doing business as USAMP is a real, enforceable agreement, (2) that Mount Pleasant has consistently enforced the Agreement, (3) that any lapses in enforcement were honest mistakes, and (4) that Mount Pleasant's purpose in entering into the Agreement was to reduce the demands selective youth soccer programs were making upon its recreation staff.

## IV.    Analysis

### A.    Municipal Liability

Cainhoy seeks relief pursuant to § 1983, which provides injured persons—including corporations—a federal cause of action for relief against a person who, acting under color of state law, violates a federally protected right. 42 U.S.C. § 1983; *see also* Martin A. Schwartz, Section 1983 Claims & Defenses § 2.01 (*Who May Bring Suit Under Section 1983*) (collecting cases). A plaintiff must allege a deprivation of a federal right and must allege that the person who deprived plaintiff of that right acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). A municipality is a person amenable to suit under § 1983, but municipal liability requires the plaintiff to show that the municipal custom or policy deprived a federally protected right. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

There is no dispute that the enforcement of the Agreement's exclusivity provision constitutes enforcement of a municipal policy under color of state law. The only contentious element of Cainhoy's claim is whether Mount Pleasant has deprived Cainhoy of any federally protected right by excluding Cainhoy from use of MPRD soccer fields. Cainhoy alleges that Mount Pleasant's enforcement of the Agreement's exclusivity provision deprives Cainhoy of a federally protected right because it denies Cainhoy the equal protection of the laws. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). A single plaintiff may bring an equal protection claim as a "class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal quotation marks omitted).

"The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. The rational basis test "is so deferential that even if the government's actual purpose in creating classifications is not rational, a court can uphold the regulation if the court can *envision* some rational basis for the classification." *Guerra v. Scruggs*, 942 F.2d 270, 279 (4th Cir. 1991) (emphasis in original). Courts in the Fourth Circuit have applied the rational basis standard of review to equal protection challenges brought by parties excluded from public facilities by a contractual exclusivity provision. *See Capili v. Shott*, 487 F. Supp. 710, 713 (S.D. W. Va. 1978) ("A contract between the Hospital and some of its staff members to operate a certain

-16-

specialized facility to the exclusion of other physicians, equally qualified, is not necessarily

unreasonable or arbitrary, and may be justified in view of the ends to be accomplished thereby.");

*see also Capili v. Shott*, 620 F.2d 438, 439 (4th Cir. 1980) (per curiam) (affirming district court's

conclusion that the question of whether the governing body of a public hospital can constitutionally

treat physicians differently is governed by the traditional rational basis inquiry"). Cainhoy

concedes that the rational basis test applies to its claims in this case. (Resp. Opp'n Summ. J. 6.)

The conduct at issue is the exclusion of Cainhoy from MPRD soccer fields; thus, Cainhoy

is deprived of the equal protection of the laws if and only if the exclusivity provision of the

Agreement has no rational relationship to a legitimate interest of Mount Pleasant. Cainhoy

contends that Mount Pleasant enforces a sham Agreement only when it operates to exclude

Cainhoy from town soccer fields, that there is no rational basis enforcing the Agreement in such a

selective fashion, and that such selective enforcement demonstrates the that the Agreement is a

mere pretext for excluding Cainhoy. Cainhoy also contends that there is no rational basis for any

agreement denying Cainhoy the opportunity to use town soccer fields (for a fair fee) when they

are not otherwise in use, and that an exclusivity agreement with a provider of "elite" soccer

programs is disconnected from any legitimate town interests.

Cainhoy's contentions are sufficient to state a § 1983 claim against Mount Pleasant. The

undisputed facts of this case, however, refute those contentions, and so Mount Pleasant is entitled

to summary judgment. The Court finds no genuine dispute that the Agreement is a valid contract

with a real entity that is not selectively enforced to exclude Cainhoy. *See* Statement of Facts,

*supra*. The Court also finds that Mount Pleasant has stated a legitimate interest rationally related

to the Agreement's exclusivity provision:

> This 'exclusive' [use provision] would allow SCUMP to use certain facilities, but
> would not allow for a competing club to use the fields. If another local club entered

-17-

> the scene—including a new club created by the parents of children who did not
> make the first-string teams of SCUMP—that would have created a substantial
> problem and jeopardized viability of the plan to get this program out of the
> Recreation Department. Two or three weaker clubs would be less attractive on a
> variety of levels and more likely to fail. This would have been true even if there
> were unlimited numbers of soccer fields.

(Ayoub Aff. 2.) If the parents of children not selected for participation in "elite" programs—at all

or on the "first-string" teams—could simply form their own clubs and teams with equal rights of

access to town fields, then there could be no "elite" soccer program. A program that cannot say

no is not an "elite" program.[5] And MPRD perhaps wanted someone else to say no to upset parents:

"coordinating with parents in regards to participation in the elite program was occupying

significant periods of time for multiple members of the Recreation Department staff." (*Id.* at 1.)

Whether MPRD *actually* wanted that is immaterial, the rational basis test is satisfied because the

Court can *envision* that as a rational basis for the exclusivity provision. *See Guerra*, 942 F.2d at

279.

Moreover, it is highly unlikely that town officials years ago expressed a desire to outsource

selective soccer programs for years simply to "set up" the exclusion of Cainhoy—particularly since

Cainhoy then was a Berkeley County soccer club founded to offer soccer to rural residents, who

otherwise faced "a 45-minute trek to Mount Pleasant's crowded practice fields." Jessica Johnson,

*Cainhoy parents team up for new soccer club*, Post & Courier (July 16, 2009). Subsequently,

Cainhoy's plans to build facilities in Berkeley County fell through and Cainhoy experienced

growth in Mount Pleasant; it is now predominately a Mount Pleasant club in need of soccer

facilities. (Tunesi Aff. ¶ 8 (stating that, currently, most Cainhoy players are Mount Pleasant

---

[5] Furthermore, there is no contention that Mount Pleasant could not exercise its own proprietary
property interests in a manner disallowing use of town property by any soccer program other than
those conducted by the town—*i.e.*, to the exclusion of Cainhoy. Mount Pleasant has simply
licensed a part of that proprietary interest to the Booster Club.

residents)); *Re: Cainhoy Soccer is suing the Town of Mount Pleasant*, S.C. Soccer High Sch. Coaches Ass'n, http://forums.scsoccer.com/ubbthreads.php?ubb=showflat&Number=170564 (Nov. 22, 2015) (Cainhoy president David Tunesi discussing this legal action on the website of the South Carolina High School Soccer Coaches Association). Cainhoy's equal protection argument is anachronistic: Cainhoy argues that a 2011 agreement is a sham to exclude it from Mount Pleasant's facilities, even though it was then trying to be an option for families who did not want to travel to Mount Pleasant and, to that end, was building facilities in Berkeley County.

**B.      Individual Defendants**

In addition to the Town of Mount Pleasant, Cainhoy names as individual defendants, in both their official and personal capacities, the director of the recreation department, the mayor, and the members of town council members as of the date when the complaint was filed. Council members who have left office (Defendants Thomasena Stokes-Marshall, Chris Nickels, and Chris O'Neil) have no official capacity for suit[6]; persons who were not yet members of the town council when the Agreement was made (Defendants Chris Nickels, Chris O'Neil, Mark Smith, and Gary Santos) cannot have personal liability for their predecessors' official acts. Two individual Defendants, Chris Nickels and Chris O'Neil, are not now members of the town council nor were they members when the Agreement was made.

Because Cainhoy fails to establish any deprivation of a constitutional right, the individual Defendants are also entitled to summary judgment. The Court need not consider which individual Defendants are or are not proper Defendants in this action, nor the individual Defendants' possible

---

[6] It is also unclear whether current Mayor Linda Page, who was a member of the town council when the Agreement was approved, can be sued in her official capacity as mayor for her official acts as a town council member before becoming mayor.

immunity defenses, which in any event are waived.[7]  However, the Court does note that Cainhoy's

good faith basis for suing these individuals in a personal capacity is doubtful.  Typically in a §

1983 action, officers are sued individually for damages to avoid Eleventh Amendment immunity

issues, and officially for injunctive relief.  There is no Eleventh Amendment issue in this case,

Cainhoy seeks no injunctive relief regarding the individual defendants, and damages from town

officers in their official capacities cannot result in recovery beyond any recovery from the town

itself.  *See Kentucky v. Graham*, 473 U.S. 159, 165–67 & n.14 (1985) ("There is no longer a need

to bring official-capacity actions against local government officials, for under *Monell*, local

government units can be sued directly for damages and injunctive or declaratory relief." (citation

omitted)).  But Cainhoy does seek punitive damages, which are not available from the town or

from town officials in their official capacities.  *Owen v. City of Independence*, 445 U.S. 622, 657

(1980).  So the apparent motivation for suing town officials personally is punitive damages—

although, since punitive damages require "evil motive or intent" or "callous indifference" to the

rights of others, one would expect Cainhoy to sue only individuals actually involved with the

Agreement.  *See Smith v. Wade*, 461 U.S. 30, 56A (1983).  Haling individual town council

members into court and seeking punitive damages from them merely because, four years ago, they

(or their predecessors in office) voted in favor of a resolution (then unopposed by any member of

the public) authorizing an agreement with a local soccer club to provide soccer instruction for

children borders on abuse of process.  *C.f. Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974) (noting

"(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who

---

[7] Defendants assert immunity defenses in their answer to the complaint (Answer ¶ 24, Dkt. No. 2, Dec. 11, 2015), but, because those defenses were not briefed, they are waived.  *See Noel v. Artson*, 297 F. App'x 216, 218 (4th Cir. 2008) (holding that defendants waived immunity defenses mentioned "briefly in their Answer" but argued in "full-blown form" only in reply to the opposition to summary judgment).

is required, by the legal obligations of his position, to exercise discretion" and recognizing "(2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good").

### C.    Equitable Issues

The Court is not blind to the equitable issues underlying the complaint. Cainhoy has over 700 players who are resident in Mount Pleasant—about as many as USAMP. Yet the parents of Cainhoy players must pay taxes to support fields available to USAMP but not Cainhoy. Although they chose to enroll their children with Cainhoy rather than USAMP that may have been an empty choice given that USAMP is about five times as expensive as Cainhoy (which was founded in part to provide affordable youth soccer instruction). Families who cannot afford youth soccer fees in the thousands of dollars must pay taxes to support facilities reserved for the families who can afford those fees—facilities from which the youth programs that they can afford are barred. *See, e.g.*, Recreation Comm. Meeting Mins. 1–5 (June 30, 2014) ("[Councilman Gary Santos] has had citizens contact him and complain about having to pay $2,000 for the children to play in a level that the Recreation Department does not offer. . . .  [T]hey play in Cainhoy and then have to pay to rent fields in Mount Pleasant for their children to play on. . . .  [T]hey are feeling like they are double taxed. . . .  [T]here are residents who cannot pay $2,000 to play . . . ."). That may be a powerful argument, but it is an argument appropriately addressed to the voters of Mount Pleasant and their elected representatives. This case presents no federal constitutional issue, and this Court cannot—and would not—take over management of local youth soccer on the basis of a plaintiff's policy disagreements with local elected authorities.

## V.  <u>Conclusion</u>

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment

(Dkt. No. 5).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

May 12, 2016
Charleston, South Carolina